**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| National Association of Diversity Officers in Higher Education, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Donald J. Trump, in his official capacity as President of the United States, et al., <br><br> Defendants. | Civil Action No. 1:25-cv-333-ABA |

<u>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR A TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

Page

BACKGROUND ...................................................................................................2

LEGAL STANDARD............................................................................................9

ARGUMENT .......................................................................................................10

I.    Plaintiffs Are Likely to Succeed on The Merits.................................................10

    A.    The Termination Provision and the Certification Requirement Exceed the President's Authority. ......................................................................... 11

        1.    The Termination Provision exceeds the President's authority. ............... 12

        2.    The Certification Requirement violates the separation of powers........... 13

    B.    The Termination Provision and the Investigation Provision Violate Due Process. ........................................................................................ 14

        3.    The Termination Provision violates Due Process because its key terms are undefined and susceptible to arbitrary enforcement. ............... 15

        4.    The Investigation Provision violates Due Process because its key terms are undefined and susceptible to arbitrary enforcement. ............... 16

    C.    The Certification Requirement and the Investigation Provision Violate the First Amendment. .................................................................... 17

        5.    The Certification Requirement violates the Free Speech Clause............. 18

        6.    The Investigation Provision violates the Free Speech Clause. ................ 20

II.    Plaintiffs Are Suffering Irreparable Harm........................................................21

    D.    Plaintiffs Are Suffering Irreparable Harm from the Termination Provision. ....... 22

    E.    Plaintiffs Are Suffering Irreparable Harm from the Certification Requirement. ................................................................................... 24

    F.    Plaintiffs Are Suffering Irreparable Harm from the Investigation Provision. .................................................................................. 27

III.    The Balance of Equities and the Public Interest Favor Enjoining the Unlawful Orders........28

IV.    The Court Should Grant the Carefully Crafted Injunctive Relief Requested by Plaintiffs....29

    G.    The Court should issue an immediate TRO to maintain the status quo............... 29

    H.    The Court should issue appropriate preliminary injunctive relief ....................... 30

CONCLUSION....................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013)......................... 18, 20

*Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482 (D. Md. 2020) ............................ 22

*Boos v. Barry*, 485 U.S. 312 (1988)............................................................................................ 18

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ....................................................................... 17

*Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625 (4th Cir. 2016)............................................... 19

*Children's Hosp. of the King's Daughters, Inc. v. Price*, 258 F. Supp. 3d 672 (E.D. Va. 2017), *aff'd in part, vacated in part sub nom. Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615 (4th Cir. 2018)................................................................................... 22

*City & Cty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ................... 11, 12, 13, 14

*Cty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017) *aff'd in part and vacated in part on other grounds* at 897 F.3d 1225 (9th Cir. 2018) ................................................... 16

*Dames & Moore v. Regan*, 453 U.S. 654 (1981)........................................................................ 12

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................................................... 25

*Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495 (4th Cir. 1981) ............................. 29

*Frisby v. Schultz*, 487 U.S. 474 (1988) ....................................................................................... 19

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)..................................................................... 17

*Hill v. Colorado*, 530 U.S. 703 (2000) .................................................................................. 15, 16

*Honeyfund.com v. Desantis*, 622 F. Supp. 3d 1159 (N.D. Fla. 2022), *aff'd* 94 F.4th 1272 (11th Cir. 2024) ....................................................................................................................... 19

*Humanitarian Law Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049 (C.D. Cal. 2006) ............................................................................................................................... 15, 16

*In re Aiken Cty.*, 725 F.3d 255 (D.C. Cir. 2013)..................................................................... 12, 14

*J.O.P. v. U.S. Dep't of Homeland Security*, 409 F. Supp. 3d 367 (D. Md. 2019) ....................... 30

*Johnson v. United States*, 576 U.S. 591 (2015) .................................................................... 15, 16

*JTH Tax, LLC v. White*, No. 2:22-cv-272, 2023 U.S. Dist. LEXIS 81353 (E.D. Va. May 8, 2023) ............................................................................................................................... 26

*Juliana v. United States*, 947 F.3d 1159 (9th Cir. 2020) ............................................................. 29

*Kentucky v. Biden*, 57 F.4th 545 (6th Cir. 2023) ......................................................................... 14

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330 (4th Cir. 2021) ..................... 25

*Maages Auditorium v. Prince George's Cty., Md.*, 4 F. Supp. 3d 752 (D. Md. 2014), *aff'd*, 681 Fed. App'x 256 (4th Cir. 2017) ......................................................................................................... 10

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ....................................................................... 1

*Montgomery Cty. Ass'n of Realtors v. Realty Photo,* 783 F. Supp. 952 (D. Md. 1992) ............... 29

*Mt. Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197 (4th Cir. 2019) ........................................ 22

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir. 1994) .......................................................................................................................................... 26

*Nat'l Pub. Radio, Inc. v. Klavans*, 560 F. Supp. 3d 916 (D. Md. 2021) ........................................ 29

*New Jersey Civ. Just. Inst. v. Grewal*, No. CV 19-17518, 2021 WL 1138144 (D.N.J. Mar. 25, 2021) ......................................................................................................................................... 28

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ......................................................... 25

*New York v. Trump*, 2025 U.S. Dist. LEXIS 17593 (D.R.I. Jan. 31, 2025) ................................. 27

*New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 WL 357368 (D.R.I. Jan. 31, 2025) ............ 30

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................................................... 10

*North Carolina Growers' Ass'n, Inc. v. Solis*, 644 F. Supp. 2d 664 (M.D.N.C. 2009) ................ 29

*Pickering v. Board of Education*, 391 U.S. 563 (1968) ................................................................. 20

*Planned Parenthood of Cen. N. Carolina v. Cansler*, 804 F. Supp. 2d 482 (M.D.N.C. 2011) .... 27

*Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573 (4th Cir. 2023) ........................................ 20

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ............................................................... 18, 19, 21

*Reno v. ACLU*, 521 U.S. 844 (1997) ............................................................................................. 19

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002) ........................................................... 19

*Roe v. Dep't of Def.*, 947 F.3d 207 (4th Cir. 2020) ................................................................. 10, 30

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995) ...................................... 18

*Rust v. Sullivan*, 500 U.S. 173 (1991) .......................................................................... 18

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020) ........... 18

*Santa Cruz Lesbian and Gay Community Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020) 26

*Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*, 535 F. Supp. 3d 548 (S.D. W.Va. 2021) ................. 25

*South Dakota v. Dole*, 483 U.S. 203 (1987) .................................................................. 14

*State v. Su*, 121 F.4th 1 (9th Cir. 2024) ........................................................................ 12

*Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571 (2017) ................................... 30

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) ......................... 18, 19

*United States v. Williams*, 553 U.S. 285 (2008) ...................................................... 15, 16

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ..................................................... 10

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .................................. 11

*Youngstown*, 343 U.S. at 587-88 ............................................................................... 12

**Statutes**

18 U.S.C. § 287 .............................................................................................................. 3

31 U.S.C. § 3729 ............................................................................................................ 3

31 U.S.C. § 3730 ............................................................................................................ 3

Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25 .................................. 12

**Constitutional Provisions**

U.S. Const. art. I, § 8 .................................................................................................. 12

U.S. Const. art. I, § 9 .................................................................................................. 11

**Other Authorities**

11A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2948.1(3d ed. 1998).
.................................................................................................................................. 28

Millions of people, organizations, and communities have found themselves in turmoil since the President issued two Executive Orders[1] that aim to rid the country of diversity, equity, and inclusion, principles that are fundamental to the country's history and Plaintiffs' existence. In the week since Plaintiffs filed this case, their worst fears have become reality. The Orders and their implementation have wreaked havoc: agency Defendants have begun to freeze, or even terminate, grants and contracts; the livelihoods of Plaintiffs' members, and countless others, are in imminent danger; and individuals and institutions are forced to censor themselves for fear of losing federal funding or being targeted by imminent federal investigations. These harms stem directly from the Orders, that seek to suppress views that the President disfavors.

But the President simply does not wield that power. And contrary to his suggestions otherwise, his power is not limitless. The foundation of this country is built on the notion of separation of powers and a limited executive, authorized only to exercise those powers granted to him in the Constitution, and only in ways that do not violate the rights of the people. The President does not make the law: that is Congress's role. And more than 200 years of precedent—near uniformly respected by all three branches of government—have established that it is "emphatically the province and duty of the [judiciary] to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). And try as he might to provoke a constitutional crisis by usurping congressional power and violating the First and Fifth Amendment rights of Plaintiffs and countless others, the law here is clear: The President's actions violate the separation of powers, and his unconstitutional acts are sowing fear, chilling speech, and limiting the exercise of academic

---

[1] Decl. of Brooke Menschel ("Menschel Decl.), Ex. 1, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order 14151 ("J20 Order"); Menschel Decl., Ex. 2, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Exec. Order 14173 ("J21 Order") (collectively "Orders" or "J20 and J21 Orders.")

freedom. Absent preliminary relief, Plaintiffs, their members, and their constituents, will suffer. Plaintiffs ask this Court to act swiftly to prevent the irreparable harm that flows from the Orders.

## BACKGROUND

President Trump seeks to eliminate diversity, equity, inclusion, and accessibility ("DEIA"), both from the federal government and the private sector. His mission is not new, yet what he seeks to outlaw as "illegal DEIA" is ever shifting. During his campaign, President Trump vowed to "remov[e] all Marxist diversity, equity, and inclusion bureaucrats" from universities. Menschel Decl., Ex. 3. And, in a recent executive order, President Trump ordered the "aboli[tion] [of] every DEI office within the" Armed Forces, and suggested that DEI work "subverts meritocracy, perpetuates unconstitutional discrimination, and promotes divisive concepts or gender ideology." Menschel Decl., Ex. 4. In yet another executive order, President Trump bemoaned alleged "illegal racial discrimination [in federal hiring] under the guise of 'equity.'" Menschel Decl., Ex. 5. The J20 and J21 Orders, rather than providing clarity, only add to the confusion.

### _The Orders and the Challenged Provisions_

The J20 Order directs government officials to eliminate "DEI," "DEIA," and "environmental justice" from the federal government, including by closing all related offices, positions, and functions. J20 Order § 2(b)(i). Meanwhile, the J21 Order targets the private sector—including corporations, large nonprofits, and higher education institutions—that have allegedly "adopted and actively use[d] dangerous, demeaning, and immoral race- and sex- based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights laws of this Nation." J21 Order § 1. Plaintiffs challenge three provisions in the two Orders.

**Termination Provision.** The J20 Order attacks what it describes as "equity-related grants

or contracts." It demands "each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM . . . terminate, to the maximum extent allowed by law, all . . . 'equity related' grants or contracts'" within 60 days. *Id.* § 2 (the "Termination Provision"). The J20 Order does not define "equity-related."

**Certification Requirement.** The J21 Order instructs agency heads to "include in every contract or grant award" a "term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(b)(iv)(B) (the "Certification Requirement"). The order does not define what it means to "promot[e] DEI" in a manner that violates "applicable Federal anti-discrimination laws," nor does it clarify whether the Certification Requirement applies only to new contracts. *Id.* A certification, found to be materially false, may result in treble damages, penalties, and potentially attorneys' fees under the False Claims Act ("FCA"). *See id.* § 3(b)(iv)(A); 31 U.S.C. §§ 3729(a) & 3730(d). In some circumstances, FCA violations can lead to criminal liability. *See* 18 U.S.C. § 287.

**Investigation Provision.** The J21 Order promises to "deter" those in the private sector from engaging in "Illegal DEI Discrimination and Preferences." *Id.* § 4(b). Within 120 days, administration officials must issue a "strategic enforcement plan" that identifies "the most egregious and discriminatory DEI practitioners in each sector of concern." *Id.* § 4(b)(ii). Each agency must "identify up to nine potential civil compliance investigations of" certain types of organizations, including "institutions of higher education with endowments over 1 billion dollars." *Id.* § 4(b)(iii). The Attorney General must also identify "[o]ther strategies to encourage the private sector to end illegal DEI . . ." *Id.* § 4(b)(iv). The J21 Order does not define "DEI," "illegal DEI," "illegal discrimination or preferences," or "illegal DEI and DEIA policies." *Id.* § 1, 4.

### *The Implementation of the Orders*

**Termination Provision Implementation.** The Termination Provision has been haphazardly implemented. On January 22, 2025, Defendant Department of Labor ("DOL") distributed a memo directing grantees to "cease all award activities related to DEI or DEIA." Menschel Decl., Ex. 6. DOL sent a notice letter to Plaintiff ROC, among others, with a directive to immediately "cease all activities related to 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA)" consistent with the requirements of" the Orders. Menschel Decl., Ex. 7. In a separate email to ROC's employees, DOL repeated the directive and added that any "cost incurred on such activities, after the issuance of this notice, will not be considered allowable, and if incurred will be disallowed." Menschel Decl., Ex. 8. That email added that DOL "is reviewing all active federal awards and will take appropriate action, including terminating the award, consistent with the requirements of" the Orders. *Id.* Likewise, Plaintiff Baltimore received a letter from the U.S. Department of Health and Human Services ("HHS") with respect to an award it received from the Centers for Disease Control and Prevention ("CDC") informing Baltimore that, under the Orders, the City "must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting 'diversity, equity, and inclusion' (DEI) at every level and activity, regardless of [its] location or the citizenship of employees or contractors, that are supported with funds from this award." Menschel Decl., Ex. 9.

In a February 5, 2025, memo, Defendant Attorney General Pam Bondi instructed Defendant Department of Justice ("DOJ") components to submit a report by March 15, 2025, confirming that "all 'equity-related' grants or contracts" have been terminated in compliance with the Termination Provision. Menschel Decl., Ex. 10 ("DOJ Implementation Memo"). That memo further directs DOJ components to "pay particular attention to ending references to DEI or DEIA in (1) training and programs, including references to 'unconscious bias,' 'cultural sensitivity,'

'inclusive leadership,' and any emphasis on race- or sex-based criteria rather than merit; (2) policies and guidelines, including hiring, promotion, or performance-evaluation policies; and (3) vendor contracts and budget materials." *Id.*

The Defendant Department of Education ("Ed."), in a memo from Defendant Acting Secretary Denise Carter, vowed to review and eliminate all grants to ensure that the department does not fund "discriminatory practices—including in the form of DEI . . ." Menschel Decl., Ex. 12. Indeed, just days ago, Ed. reportedly cut $881 million in federal research and contract funding. Cuts reportedly impact at least 29 grants, totaling $101 million, for training on DEI, and 170 contracts for projects funded by the Institute of Education Sciences. Menschel Decl., Exs. 13, 14.

**Certification Requirement Implementation.** The Office of Personnel Management ("OPM") has failed to provide guidance on federal agencies' compliance with the Certification Requirement. On January 22, 2025, the White House issued a "Fact Sheet," which explained that the Certification Requirement "requires simple and unmistakable affirmation that contractors will not engage in illegal discrimination, including illegal DEI." Menschel Decl., Ex. 15.

Certain agencies have reportedly notified federal fund recipients, either contractors or grantees, of the new Certification Requirement, noting a change to "United States law":

> Due to changes in United States law, your company may be prohibited from contracting with the U.S. Government if you operate any programs promoting diversity, equity, and inclusion (DEI), affirmative action, and equal opportunity programs that violate any applicable anti-discrimination laws, and [sic] agree that such certification is material for purposes of the government's payment decision and therefore subject to the False Claims Act. See 31 U.S.C. 3729(b)(4).

Menschel Decl., Ex. 16.

**Investigations Provisions Implementation.** On February 5, 2025, Defendant Attorney General Bondi issued another implementation memo directing the DOJ Civil Rights Division and Office of Legal Policy to submit a report "[including] proposals for criminal investigations and for

up to nine potential civil compliance investigations" to "deter the use of DEI and DEIA programs and principles." Menschel Decl., Ex. 17 ("DOJ Deterrence Memo"). That deterrence plan, for civil and criminal enforcement, is due to the Associate Attorney General by March 1, 2025. *Id.*

### *The Impact of the Orders on Plaintiffs and their Communities*

In just over three weeks, the Orders have already wreaked havoc on Plaintiffs, their members, and their communities. Plaintiff National Association of Diversity Officers in Higher Education ("NADOHE") has institutional and individual members that are suffering significant harm because of the Orders. The Termination Provision threatens the termination of institution-sustaining grants and contracts held by NADOHE's institutional members awarded by agency Defendants. Ex. 19, Declaration of NADOHE ("NADOHE Decl.") ¶¶ 16-18. The ambiguity of the Termination Provision is breeding fear and already forcing irreversible harm by chilling core political speech and academic freedom. *See Id.* ¶¶ 19-26. For example, Institutional Member A cancelled a conference on alternate models of education at Historically Black Colleges and Universities because the program was funded in part by a grant from DOL that was at threat. *Id.* ¶ 22.

The ambiguity of the Certification Requirement has left NADOHE's institutional members with untenable choices: risk civil, or even criminal, enforcement for violating the FCA by certifying they do not promote DEI without knowing what the government means, lose federal funding if they don't certify, or censor themselves and cancel programs entirely to avoid drawing the ire of the Administration. *Id.* ¶ 28. At least six NADOHE institutional members, Institutional Members B-G, are subject to a recently issued university-system-wide order that takes the latter approach by barring any curricular programs or requirements that relate to the prohibited DEI topics listed in the J21 Order. *Id.* ¶ 29. And the Investigation Provision threatens NADOHE

institutional members, including NADOHE Institutional Member H, which has an endowment greater than $1 billion. *Id.* ¶ 31. As a result of the Investigation Provision, NADOHE's institutional member's speech is chilled by the consequences that would flow from being publicly named as the target of an investigation and from the harm that would result from any such investigation. *Id.*

In addition, NADOHE itself is harmed as it grapples with how to square its core values with the Orders. Its work includes supporting diversity professionals and higher education institutions in a variety of ways, including in the face of backlash against diversity, equity, and inclusion on campus, *id.* ¶¶ 7, 9, 15. The Orders have forced NADOHE to re-allocate resources that it would otherwise spend on day-to-day operations of the organization. *Id.* ¶¶ 39-42. And as NADOHE's members seek to comply with the Orders, and members fear that mere association with NADOHE could be interpreted as a violation or make them an investigation target, NADOHE anticipates that its membership will decline, decreasing the conference and membership dues that sustain the organization. *Id.* ¶¶ 44-45.

Likewise, the members of Plaintiff American Association of University Professors ("AAUP") rely on federal grants through the National Institutes of Health, NSF, and HHS, among many others, to fund or supplement salaries. Ex. 20, Declaration of Todd Wolfson ("AAUP Decl.") ¶¶ 14, 21, 40. Some of those members have received instructions to cease work that is seemingly related to diversity, equity, inclusion, and accessibility. *Id.* ¶ 20. Even members whose grants are unrelated to diversity, equity, inclusion, or accessibility are affected. One such member with a grant application pending before the National Oceanic and Atmospheric Association ("NOAA") received an email from NOAA instructing them to remove their pronouns from their email signature. *Id.* ¶ 21(d)(iii). These members' jobs are in peril as they wait anxiously to learn whether they will be able to continue supporting themselves and their families. *Id.* ¶ 21, 23. And even

members whose funding is not directly impacted are fearful that their scholarship, research, or participation in specific programs may endanger their institutions or lead to adverse employment consequences. *Id.* ¶ 23, 39.

ROC has been similarly impacted by the Orders. The organization relies heavily on federal support "to realize its mission and vision" of "ensuring diversity, equity, inclusion, and accessibility across the restaurant industry." Ex. 21, Declaration of Teofilo Reyes ("ROC Decl.") ¶¶ 8, 13. One of ROC's specific efforts provides sexual harassment training and a referral network to connect survivors with support services. *Id.* ¶ 17. A DOL grant has allowed ROC to expand the program. *Id.* ¶¶ 16, 18. Another DOL grant allows ROC United to provide heat safety training to over 600 restaurant workers, including some who operate in the most difficult working conditions. *Id.* ¶¶ 22, 23. After the Orders issued, ROC received notifications from DOL related to both grants, demanding that the organization "cease" certain activities that may be related to diversity, equity, inclusion, or accessibility. *Id.* ¶¶ 26-29. Because the notifications did not specify which activities were prohibited or define central terms, ROC stopped all work funded by the two grants. *Id.* ¶¶ 27, 30. In turn, the organization anticipates cancelling training programs and suffered a significant disruption to its operations. *Id.* ¶¶ 30-31. Unless the funds are restored, ROC may not be able to continue those programs and would suffer significant reputational harm. *Id.* ¶¶ 32, 35. Equally alarming, the Orders put all of ROC's work—even work *not* funded by the government—at risk. Because ROC's work "is deeply rooted in equity and inclusion for workers," the organization fears that it will be investigated, lose federal funds, or face other penalties if it continues to fulfill its mission. *Id.* ¶¶ 37-42.

Baltimore, too, relies on federal grants and contracts to support a range of services and programs for which Baltimore is accountable, including public safety, housing, the environment,

the local economy, infrastructure, and accessibility for its citizens with disabilities. Ex. 22, Declaration of Faith Leach ("Baltimore Decl.") ¶ 17. All told, Baltimore relies on around $270 million in active federal grant money. *Id.* ¶ 18. Among other things, Baltimore has received grants through the Department of Energy's ("Energy") Weatherization Assistance Program, HHS's Family Planning Service Delivery Improvement Research Grant program, and the CDC's Public Health Infrastructure Grant program. *Id.* ¶¶ 19-11. Without this funding, Baltimore's elderly citizens and citizens with disabilities could lose support for weatherizing their homes, its LGBTQ+ youth could lose equitable access to clinical services, and its health department could lose its DEI Coordinator, whose role is essential to equipping staff with the skills and training they need to serve members of marginalized groups with the dignity and respect they deserve. *Id.* More broadly, untold others of Baltimore's citizens could lose access to essential services if the City is unable to continue receiving the federal funds on which it relies. What's more, Baltimore is uncertain about whether it can continue to express its commitment to diversity, equity, inclusion, and accessibility through City initiatives—such as its Warm Welcome program, which encourages local businesses to embrace those values, *id.* ¶ 16—City-hosted events—including its annual Civil Rights Week celebration, which has historically included panels and sessions touching on the inequitable treatment of women, people of color, and immigrants and emphasized the inclusion of residents with disabilities, *id.* ¶ 15—and City-operated programs and services—including its Office of Equity and Civil Rights. *Id.* ¶ 10-13.

## LEGAL STANDARD

"A party seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest. *Roe v. Dep't*

*of Def.*, 947 F.3d 207, 219 (4th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) (cleaned up). In cases against the government, the balance of equities and public interest factors merge into a single inquiry. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The same standard applies to a temporary restraining order ("TRO"). *Maages Auditorium v. Prince George's Cty., Md.*, 4 F. Supp. 3d 752, 760 n.1 (D. Md. 2014) (standard for a TRO is the same as for a preliminary injunction), *aff'd*, 681 Fed. App'x 256 (4th Cir. 2017).

## ARGUMENT

### I.  Plaintiffs Are Likely to Succeed on The Merits.

Plaintiffs are likely to succeed on the merits of their claims that the J20 Order's Termination Provision and the J21 Order's Certification Requirement exceed the President's authority and violate the separation of powers. These provisions lack any constitutional or statutory authorization and attempt to unlawfully usurp Congress's spending power.

Plaintiffs are also likely to prevail on their Due Process Clause claims. The J20 Order's Termination Provision fails to specify what precisely must be terminated, lending itself to arbitrary and discriminatory enforcement that violates the Due Process Clause. The Investigation Provision in the J21 Order suffers the same infirmities.

Likewise, Plaintiffs are likely to succeed on the merits of their claims that the J21 Order violates the Free Speech Clause of the First Amendment. The Certification Requirement muzzles all grantees and contractors by adding a new condition to receive federal funds, *i.e.*, that they not "promot[e] DEI" in a way that the Administration deems unlawful. And the Investigation Provision threatens civil and criminal enforcement against those who support "illegal DEI and DEIA principles," which impermissibly chills the exercise of the constitutionally protected speech of the members of Plaintiffs NADOHE and AAUP.

**A. The Termination Provision and the Certification Requirement Exceed the President's Authority.**

When the President acts, or directs subordinates to act, he must do so based on either constitutional or statutory authority. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). When the President lacks constitutional or statutory authority for his actions, courts enjoin the executive action and direct federal agencies not to act under the directive. *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1245 (9th Cir. 2018) (affirming injunction entered by the district court enjoining President Trump's executive order).

To determine whether the President is operating within his constitutional and statutory authority, courts turn to the separation of powers framework articulated by Justice Jackson in his concurrence in *Youngstown*:

> (1) when the President acts pursuant to "an express or implied authorization of Congress," and therefore "his authority is at its maximum," *Id.* at 635;
>
> (2) when the President acts "in absence of either a congressional grant or denial of authority," and therefore "he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain," *Id.* at 637; and
>
> (3) when the President "takes measures incompatible with the express or implied will of Congress," and therefore "his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter," *Id.*

The United States Constitution "exclusively grants the power of the purse to Congress, not the President" through the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, and the Spending Clause, U.S. Const. art. I, § 8, cl. 1; *City & Cty. Of San Francisco*, 897 F.3d at 1231. Furthermore, the Constitution gives Congress the unequivocal authority to enact laws; the President is limited to "recommending … laws he thinks wise and vetoing … laws he thinks bad." *Youngstown*, 343 U.S. at 587-88. In short, "the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement[s] with Congress." *In re Aiken Cty.*, 725 F.3d

255, 260 (D.C. Cir. 2013) (Kavanaugh, J.).

By attempting to terminate grants provided for by Congress and adding new conditions to duly appropriated funds, the President goes well beyond his constitutional and statutory powers.

### 1.   The Termination Provision exceeds the President's authority.

The President does not have the authority to direct federal agencies to unilaterally terminate contracts or grants merely because they deem those grants or contracts to be "equity-related." But the Termination Provision directs federal agencies to do precisely that without identifying any statutory or constitutional authority. There is no such authority.

When "the President acts in contravention of the will of Congress, [as here,] his power is at its lowest ebb[.]" *Dames & Moore v. Regan*, 453 U.S. 654, 669 (1981) (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)). The President does not possess any independent spending power under the Constitution; instead, Article I of the Constitution grants all broad spending authority to Congress, which includes directing how government funds should be spent through federal contracts and grants. *See City & Cty. of San Francisco*, 897 F.3d at 1231; *cf. State v. Su*, 121 F.4th 1, 7-13 (9th Cir. 2024).

Every contract or grant awarded by a federal agency is funded through congressional appropriation enactments. *See, e.g.*, Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25. That includes the grants and contracts awarded to Plaintiffs here. *See, e.g.*, Ex. 19, NADOHE Decl. ¶¶ 16-18; Ex. 20, AAUP Decl. ¶¶ 14-18; Ex. 22, Baltimore Decl. ¶ 26-31; Ex. 21, ROC Decl. ¶ 14-16. Despite the congressional enactments funding these contracts and awards, the agency Defendants implementing the Termination Provision fail to identify any statutory or regulatory authority that authorizes them to unilaterally terminate any grant or contract because it is "equity-related." Instead, the implementing agencies rely solely on the J20 Executive Order.

*See, e.g.*, Menschel Decl., Ex. 6 (DOL Implementation Memo); Ex. 10 (DOJ Implementation Memo; Ex. 11 (DoD Implementation Memo).

The Termination Provision exceeds the President's authority because it runs counter to Congress's appropriation of funds for the grants and contracts at issue. "Here, the Administration has not even attempted to show that Congress authorized it to withdraw federal grant [or contract] moneys from [grantees and contractors]. … Nor could it." *City & Cty. Of San Francisco*, 897 F.3d at 1234. "Because the Executive Order directs Executive Branch administrative agencies to withhold funding that Congress has not tied to [whether the funding is 'equity-related'], there is no reasonable argument that the President has not exceeded his authority." *Id.* at 1234-35; *see also id.* at 1235 ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.").

Furthermore, Defendants cannot claim that the Termination Provision can be redeemed by its clause purporting to abide by the law. *See* J20 Executive Order §§ 2(b)(i), 4(b). The Ninth Circuit rejected precisely the same argument. *City and Cnty. of San Francisco*, 897 F.3d at 1239; *see also id.* at 1240. Simply put, the J20 Executive Order's Termination Provision lacks sufficient constitutional or statutory authority, and Plaintiffs are likely to succeed on the merits.

### 2. The Certification Requirement violates the separation of powers.

The Certification Requirement violates the constitutional principles of separation of powers. As the Supreme Court reiterated in *South Dakota v. Dole*, 483 U.S. 203 (1987), Congress' spending power allows Congress, not the President, to "attach conditions on the receipt of federal funds … to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Id*. at 206 (internal citations omitted).

13

The Certification Requirement imposes a new condition on the receipt of federal funds. The Fact Sheet to the J21 Order claims, *inter alia*, that it purports to hold federal contractors to "our civil rights laws" with a "simple and unmistakable affirmation that contractors will not engage in illegal discrimination, including illegal DEI." *See* Menschel Decl., Ex. 15. Like the executive order in *City & Cty. of San Francisco* that imposed conditions on federal grants, neither the J21 Order nor the Fact Sheet provide any authority for the President to unilaterally condition the receipt of federal funds on this new Certification Requirement.

Congress has not enacted a condition to federal funding that requires the J21 Order's Certification Requirement, nor has it delegated authority to the President to do so. The President cannot rely on the Federal Property and Administrative Services Act of 1949, a law that is not cited in the J21 Order, as that Act does not support the President's attempt to usurp congressional power here. *See Kentucky v. Biden*, 57 F.4th 545, 555 (6th Cir. 2023). Nor did Congress delegate authority pursuant to the Congressional Budget & Impoundment Act. *City & Cty. of San Francisco*, 897 F.3d at 1234 n.3 (internal citations omitted); *see also Aiken Cty.*, 725 F.3d at 261 n.1 (Kavanaugh, J.) (holding that when the President wants to "spend less than the full amount appropriated by Congress for a particular project or program … the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a recission"). Accordingly, the President lacks authority to impose the Certification Requirement and Plaintiffs are likely to succeed on the merits of their claim.

### B. The Termination Provision and the Investigation Provision Violate Due Process.

A federal law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages

seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)); *see also Johnson v. United States*, 576 U.S. 591, 595 (2015). When an executive order contains terms that are not "susceptible of a clear meaning," and does not "mitigate the vagueness of the term by supplying any definition," then the provision "lends itself to subjective interpretation" and is unconstitutional. *Humanitarian Law Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1070 (C.D. Cal. 2006).

### 3. The Termination Provision violates Due Process because its key terms are undefined and susceptible to arbitrary enforcement.

The Termination Provision is unconstitutionally vague because it requires Plaintiffs to guess at what the Administration believes to be "related" to "equity" and leaves federal agencies discretion to enforce the provision in a "seriously discriminatory" manner. *See Hill*, 530 U.S. at 732. The Termination Provision is so vague that Plaintiffs do not know which funds will be cut and agency Defendants are free to pick and choose in an arbitrary and discriminatory fashion.

Implementation of the Termination Provision illustrates its vagueness and potential breadth. Based on reporting, NSF, which issued over $8 billion in grants in fiscal year 2024, is using a list of keywords to identify grants subject to the Termination Provision that includes words such as "barriers," "diversity," "female," "historically," "multicultural," "systemic," and "trauma," among other equally broad terms. Menschel Decl., Ex. 18. That scope puts many of the grants and contracts awarded to Plaintiffs, and their members, at risk of termination. *See, e.g.*, Ex. 19, NADOHE Decl. ¶¶ 16-18, 20-21; Ex. 20, AAUP Decl. ¶¶ 22-23, 25-26. Plaintiffs reasonably believe that other agency Defendants are following suit.

This type of arbitrary and unfettered discretion is precisely what our Constitution forbids. *See Cty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1216-1218 (N.D. Cal. 2017) *aff'd in part and vacated in part on other grounds* at 897 F.3d 1225 (9th Cir. 2018); *see also Humanitarian*

*Law Project*, 463 F. Supp. 2d at 1070. As such, Plaintiffs are likely to succeed on the merits of Count II, that the J20 Order's Termination Provision violates Due Process.

### 4. The Investigation Provision violates Due Process because its key terms are undefined and susceptible to arbitrary enforcement.

The Investigation Provision is unconstitutionally vague because it denies Plaintiffs NADOHE and AAUP, and their members, fair notice of what is prohibited and how to conduct themselves within the confines of the J21 Order. *See Williams*, 553 U.S. at 304 (2008) (citing *Hill*, 530 U.S. at 732); *see also Johnson*, 576 U.S. at 595. This is particularly concerning given the Attorney General's directive that criminal liability could flow from the J21 Order. Menschel Decl., Ex. 17 (DOJ Deterrence Memo). But how can a law-abiding citizen or entity avoid such liability? The J21 Order is too vague for anyone to know.

Plaintiffs NADOHE and AAUP cannot know what the J21 Order and the Investigation Provision prohibit. The J21 Order targets anyone Defendants view as supporting "dangerous, demeaning, and immoral race- and sex- based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights [sic] laws of this Nation." J21 Order § 1. But it does not say what "dangerous" or "demeaning" means. Nor does the Investigation Provision itself delineate which "DEI programs or principles" constitute "illegal discrimination or preferences." J21 Order § 4(b)(iii). Indeed, the J21 Order expressly calls for wide-ranging "measures to deter [illegal] DEI programs or principles (whether specifically denominated 'DEI' or otherwise)." The implementation of the Investigation Provision only adds to the chaos. The Attorney General's Memo does not define material terms, nor the scope of prohibited "DEI and DEIA policies and principles." Menschel Decl., Ex. 17 (DOJ Deterrence Memo).

The vagueness of the Investigation Provision, and the J21 Order, gives the Administration,

including the Attorney General, unfettered discretion. And, the use of the term "illegal" does not cabin that discretion because the President's stated objectives in signing the J21 Order is much broader than what is currently unlawful under any federal antidiscrimination law. *See, e.g.*, Ex. 20, AAUP Decl. ¶ 39(b)(iii) (faculty member instructed by NOAA to remove pronouns from emails).

Left unchecked, the Investigation Provision will outlaw the mere acknowledgment of difference or the value of diversity. What Plaintiffs have to date understood as *compliance* with antidiscrimination laws will be taken as a violation, subjecting individuals and institutions to substantial penalties, including civil and criminal investigations. The Investigation Provision "impermissibly delegates basic policy matters to [Defendants] for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972). Thus, the Investigation Provision is unconstitutionally vague, and Plaintiffs are likely to succeed on the merits of their claim.

### C. The Certification Requirement and the Investigation Provision Violate the First Amendment.

Freedom of speech is one of the most sacred constitutional rights. *E.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660-661 (2000). When the government restricts the right to speak based on content, that restriction is presumptively unconstitutional, and the government must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 171 (2015) (citations omitted). The government cannot condition funding on a speech restriction that is outside the confines of the government program. *See, e.g.*, *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 218 (2013) ("*AOSI*") (citing *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)); *see also Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 542 (N.D. Cal. 2020).

17

### 5. The Certification Requirement violates the Free Speech Clause.

The Certification Requirement violates the First Amendment by discriminating between viewpoints: it targets "particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Grantees and contractors must certify that they do not "operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws," J21 Order § 3(iv)(B), yet no similar certification about programs *opposing* "DEI"—or any other concept—is required. That is an unconstitutional viewpoint-based restriction that cannot satisfy scrutiny.[2]

*First*, Defendants cannot establish any compelling government interest. Defendants must present evidence—"more than anecdote and supposition"—of "an actual problem." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 822 (2000). They cannot. No "problem" identified in the Order (1) in fact exists; and (2) is not already addressed by existing law.

*Second*, the Certification Requirement is not narrowly tailored. A restriction on speech fails this requirement "[i]f a less restrictive alternative would serve the Government's purpose." *Playboy Entertainment Group*, 529 U.S. at 813. To satisfy this inquiry, the regulation must be neither "overinclusive" nor "underinclusive." *Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 633 (4th Cir. 2016). The Certification Requirement fails on both counts.

The Certification Requirement is "unconstitutionally overinclusive" because it "'unnecessarily circumscrib[es] protected expression.'" *Cent. Radio Co.*, 811 F.3d at 633 (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 775 (2002)); *accord Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (regulation must "target[] and eliminate[] no more than the exact source of the

---

[2] Even if the Certification Requirement were not viewpoint-discriminatory, it would still be subject to strict scrutiny because it violates the requirement that regulation of speech be *content* neutral. *See Boos v. Barry*, 485 U.S. 312, 319 (1988).

'evil' it seeks to remedy"). The Certification Requirement fails this test several times over. The J21 Order could have identified the actual conduct it prohibited, or provided specific examples of what it means to "promot[e] DEI" in a manner that "violate[s] any applicable Federal anti-discrimination law," but it did not. That leaves Plaintiffs to question whether their programs, speech, and activities connected to DEIA are lawful. *See, e.g.*, Ex. 20, AAUP Decl. ¶¶ 41-42.; Ex. 19, NADOHE Decl. ¶ 28; Ex. 21, ROC Decl. ¶¶ 27, 40. A vague law "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno v. ACLU*, 521 U.S. 844, 871-72 (1997). The Certification Requirement is also overinclusive because, to the extent the savings clause operates at all, it covers conduct that is *already* illegal under existing antidiscrimination laws—all of which impinge less upon protected expression than does the Certification Requirement. *See, e.g.*, *Honeyfund.com v. Desantis*, 622 F. Supp. 3d 1159, 1179 (N.D. Fla. 2022), *aff'd* 94 F.4th 1272 (11th Cir. 2024) (finding law not narrowly tailored because it prohibited conduct "[t]hat is already illegal").

At the same time, the Certification Requirement is "fatally underinclusive" because it "leav[es] appreciable damage to [the government's] interest unprohibited." *Cent. Radio Co.*, 811 F.3d at 633 (quoting *Reed*, 576 U.S. at 172). Notably, the Certification Requirement singles out for punishment "programs promoting DEI" but does not seek to punish other violations of "Federal anti-discrimination law" in the same way.

The Certification Requirement also unlawfully restricts speech as a precondition to receive federal funds, including grants and contracts.[3] By wielding the federal spending power as a cudgel,

---

[3] Plaintiffs do not concede that *Pickering v. Board of Education*, 391 U.S. 563 (1968) applies here, but even to the extent that it does, Plaintiffs are likely to prevail: most are speaking outside of the scope of their contracts (*but see infra* at n.4); the expression is of substantial public interest; and their significant interest in engaging in core political speech outweighs any potential government interest in managing the workplace.

President Trump and other Defendants seek to accomplish by "a condition on the receipt of federal funds" what they cannot do "as a direct regulation of speech." *AOSI*, 570 U.S. at 21. Because Plaintiffs are entitled to undiluted First Amendment rights and because the J21 Order seeks to regulate private speech concerning matters of public concern[4] in a manner unjustified by the government's interests, Plaintiffs are likely to prevail on their First Amendment claim in Count V of the complaint.

### 6.  The Investigation Provision violates the Free Speech Clause.

The Investigation Provision violates the First Amendment's Free Speech Clause by threatening enforcement action against those who embrace programs and principles that the President deems offensive or "illegal DEI and DEIA . . ." J21 Order § 1. The chilling effect of the threatened enforcement action is profound: the only way for any potential target to escape that threat is to discard any principle or program that the President might consider "illegal DEI and DEIA," whether lawful under existing antidiscrimination laws or not.

The Investigation Provision directs the Attorney General to outline specific steps to "deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise) that constitute illegal discrimination or preferences." J21 Order § 4(b)(iii). Higher education institutions with endowments of over $1 billion are among the specific targets. *Id.* And Attorney General Bondi has heeded the President's command. Citing to the J21 Executive Order, the DOJ Deterrence Memo stresses that "policies relating to 'diversity, equity, and inclusion' (DEI) and 'diversity, equity, inclusion, and accessibility' (DEIA) violate the text and spirit of our longstanding Federal civil-

---

[4] To the extent that some of Plaintiffs' speech takes place within the scope of a federal grant or contract, Plaintiffs AAUP and NADOHE are still entitled to First Amendment protection as they assert claims based in part on the threat to their members' teaching and scholarship. *See Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 582 (4th Cir. 2023).

rights laws and undermine our national unity." Menschel Decl., Ex. 17, at 1. Through the Civil Rights Division, the Attorney General commits to "investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities . . . in educational institutions that receive federal funds." *Id.* By March 1, 2025, the Civil Rights Division and the Office of Legal Policy must identify "proposals for criminal investigations," and "up to nine potential civil compliance investigations" of those targeted by "Section 4(b)(iii) of Executive Order 14173." *Id.* at 2.

On its face, the Investigation Provision restricts protected speech based on its content and viewpoint; it is therefore presumptively unconstitutional and subject to strict scrutiny. *Reed*, 576 U.S. at 171. Here, the J21 Executive Order and the Investigation Provision penalize those who support "DEI programs or principles" but do not condemn those who oppose those principles. That is plain viewpoint discrimination. The Investigation Provision advances no evidence-backed compelling government interest. Nor is it plausibly narrowly tailored. It is underinclusive by focusing exclusively on investigation of *support* for "DEI programs or principles," yet leaves untouched actual discrimination. It is also overinclusive, in its terms' vagueness and implementation, and because the Administration has swept in whole categories of protected speech. *See supra* at 6 (discussion of implementation).

The Investigation Provision is a naked attempt to suppress speech based on viewpoint, and Plaintiffs NADOHE and AAUP are likely to succeed on the merits of their claim.

## II.    Plaintiffs Are Suffering Irreparable Harm

Irreparable harm requires a "clear showing" of harm that is "neither remote nor speculative, but actual and imminent," and that the harm "cannot be fully rectified by the final judgment after trial." *Mt. Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 216 (4th Cir. 2019) (cleaned up).

Because a delayed remedy would cement Plaintiffs' ongoing economic, constitutional, and reputational harms, injunctive relief is necessary.

### D.  Plaintiffs Are Suffering Irreparable Harm from the Termination Provision.

Absent injunctive relief, Plaintiffs will suffer immediate and irreparable harm due to the Termination Provision's mandate that "equity-related" grants or contracts be terminated within 60 days of January 20, 2025. J20 Order § 2(b)(i). Loss of funding that causes "severe economic losses," and may require a plaintiff "to shutter operations that provide critical" services or resources is sufficient to show irreparable harm. *Ass'n of Cmty. Cancer Centers v. Azar*, 509 F. Supp. 3d 482, 501 (D. Md. 2020); *Children's Hosp. of the King's Daughters, Inc. v. Price*, 258 F. Supp. 3d 672 (E.D. Va. 2017), *aff'd in part, vacated in part sub nom. Children's Hosp. of the King's Daughters, Inc. v. Azar*, 896 F.3d 615 (4th Cir. 2018).

The imminence of Plaintiffs' injuries is evident from the Termination Provision's plain language. It called for immediate action from government agencies, with *at most* 60 days for the whole of the federal government to comply. J20 Order § 2. What ensued next was chaos that continues today. Agencies, in their scramble to comply, have implemented ad hoc systems of arbitrary identification and termination. *See supra* at 4-5. As federal agencies dole out one arbitrary decision after another, Plaintiffs and their members have spent the last three weeks not knowing when and whether their funding will be terminated. Ex. 20, AAUP Decl.¶ 23; Ex. 22, Baltimore Decl. ¶ 30; Ex. 21, ROC Decl. ¶ 30; Ex. 19, NADOHE Decl. ¶¶ 16-26. This uncertainty impacts their operational strategies and performance. Ex. 20, AAUP Decl. at ¶¶ 24-26; Ex. 22, Baltimore Decl. ¶ 30; Ex. 21, ROC Decl. ¶ 31; Ex. 19, NADOHE Decl. ¶24. Many of AAUP and NADOHE's institutional members have active federal grants with the term "equity" in the title, the grant proposal submitted for funding, or in other public-facing documentation. Ex. 20, AAUP

Decl. at ¶¶ 16, 23, 26; Ex. 19, NADOHE Decl. ¶ 21. And among members lacking grants that include the *term* "equity," many rely on grants addressing topics related to the *concept* of equity, including diversity, anti-racism, inclusion, accessibility, and belonging. *See, e.g.*, Ex. 20, AAUP Decl. ¶ 16, 21(d)(ii); Ex. 22, Baltimore Decl. ¶¶ 27-31, 35-38; Ex. 19, NADOHE Decl. ¶ 23. As the Termination Provision's 60-day deadline approaches, the mounting threat of termination forces Plaintiffs and their members to make irreversible ethical, legal, and institutional decisions on an untenable timeline. *See,* Ex. 20, AAUP Decl. ¶¶ 22-25, 31; Ex. 19, NADOHE Decl. ¶¶ 22, 24. DOL has already instructed at least one of NADOHE's members to cease certain activities that are, in the agency's view, connected to DEIA. Ex. 19, NADOHE Decl. ¶ 22. As such notices and terminations continue, NADOHE's members will experience severe economic losses that will lead to the eradication of critical support for students, staff, faculty, and research. *Id.* ¶ 24-25.

Similarly, ROC provides resources and training programs funded by federal grants. Ex. 21, ROC Decl. ¶¶ 14-17. But ROC had to stop granted-funded work after it received notices from DOL's Women's Bureau and OSHA, and may be forced to operate at a deficit to fulfill its mission until its funds are depleted. *Id.* ¶¶ 24, 35. Indeed, ROC has had to launch a new fundraising campaign in anticipation of further fallout from the Orders and the Termination Provision. *Id.* ¶ 35. Being forced to operate at a deficit pushes ROC towards insolvency and jeopardizes its existence.

AAUP's membership includes professionals who receive federal grants from agencies across the federal government. Ex. 20, AAUP Decl. ¶ 21. Many of these grants reference or include "equity" in the title. *Id.* ¶¶ 16, 21(d)(i). Still other members have grants addressing topics that are arguably "equity-related." *Id.* ¶ 21(b)(i). Notwithstanding these differences, the grants fund salaries for medical school faculty, graduate students, and other researchers who focus on health

equity, as well as salaries for others who study how climate change and other environmental risks impact diverse communities. *Id.* ¶¶ 21(d)(ii)(2), 23.

Baltimore receives federal grants that support a range of city services and personnel. Ex. 22, Baltimore Decl. ¶¶ 26-30. These include grants that are arguably "equity-related," whether they include "equity" in the title or not. Among other things, federal grants provide equitable access to home weatherization for Baltimore's elderly and those with disabilities, as well as equitable access to health services for Baltimore's LGBTQ+ youth. *Id.* ¶¶ 26-27. Baltimore also relies on federal grant money to support its health department's DEI Coordinator, who is integral to the department's equity strategy and is responsible for equipping staff to serve members of marginalized groups with the dignity and respect they deserve. *Id.* ¶¶ 28-30. Baltimore has already received notice that "all programs, personnel, activities, or contracts promoting 'diversity, equity, and inclusion' (DEI) . . . that are supported with funds" from a CDC award must be "immediately terminate[d]" under the J20 and J21 Orders. Menschel Decl., Ex. 9. The City is uncertain which of its programs and personnel federal grants may support, and wonders whether it needs to reallocate resources and reduce support for other programs—or shutter them altogether—just to sustain its critical municipal functions. Ex. 22, Baltimore Decl. ¶ 37. All these harms and more will continue absent injunctive relief.

**E.  Plaintiffs Are Suffering Irreparable Harm from the Certification Requirement.**

The Certification Requirement deprives Plaintiffs of their First Amendment freedoms, which alone "constitutes irreparable injury." *See Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713 (1971)); *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). Plaintiffs and their members fear they must suppress their speech, and eliminate any program, speech, or research that could fathomably fall

24

under "DEI and DEIA principles, under whatever name they may appear," to avoid potential penalties. Ex. 22, Baltimore Decl. ¶¶ 15-18, 42-43. And given that NADOHE's individual members are diversity professionals for whom promoting DEI can literally be part of their job descriptions and job titles, the chilling effect is even more acute. Ex. 19, NADOHE Decl. ¶¶ 28-29. No amount of money damages will be able to repair the harm, as compliance with the Certification Requirement would entail the dismantling of entire offices at the institutions where they work or lose federal funding entirely. The other Plaintiffs face similar risks. Ex. 20, AAUP Decl. ¶¶ 27-32; Ex. 22, Baltimore Decl. ¶¶ 10-14, 44-45.

In addition to the irreparable harm from Defendants' First Amendment violations, Plaintiffs will suffer reputational harm that threatens their very existence. *See, e.g.*, Ex. 20, AAUP Decl. ¶¶ 10-13; Ex. 19, NADOHE Decl. ¶¶ 9-17. If Plaintiffs publicly abandon part or all of their publicly declared mission and promises related to DEIA principles, that will irreparably damage their reputations as reliable advocacy organizations. *See Sogefi USA, Inc. v. Interplex Sunbelt, Inc.*, 535 F. Supp. 3d 548, 554 (S.D. W.Va. 2021) (finding irreparable harm where one party's failure to comply with an existing contract would damage the other party's reputation as a reliable, timely goods provider). And NADOHE's individual members will similarly suffer damage to their reputations as diversity professionals. Ex. 19, NADOHE Decl. ¶ 36. This reputational harm, mixed with public fear that advocacy groups will bow to the pressure of the executive orders or die off, will damage Plaintiffs' ability to fundraise, Ex. 21, ROC Decl. ¶41, or collect membership dues and conference revenues, Ex. 19, NADOHE Decl. ¶¶ 44-45, endangering Plaintiffs' viability and existence. *See JTH Tax, LLC v. White*, No. 2:22-cv-272, 2023 U.S. Dist. LEXIS 81353, at *20 (E.D. Va. May 8, 2023) (quoting *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546 (4th Cir. 1994)).

Even if Plaintiffs do not eliminate all activities and speech related to "DEI and DEIA principles," the other alternative—to wait and see what this Administration means—also causes irreparable harm. Plaintiffs could assume that their current programs, speech, and research do not violate any antidiscrimination laws as described in the J21 Order. But Plaintiffs bear significant risk in making that assumption since the J21 Order does not define either legal or "illegal DEI." Every day that Plaintiffs stay their current course, they risk federal prosecution and investigation, including under the False Claims Act, or losing federal funding altogether by not certifying. Ex. 22, Baltimore Decl. ¶ 43; Ex. 19, NADOHE Decl. ¶¶ 28-29; Ex. 20, AAUP Decl. ¶ 31.

If Plaintiffs don't certify—either by staying the course or trying but failing to meet the undefined criteria—they face imminent loss of federal grants and other funding necessary to survive. Plaintiffs, including NADOHE's institutional members, rely extensively on federal funding. Ex. 22, Baltimore Decl. ¶ 20; Ex. 19, NADOHE Decl. ¶ 16-18; *cf. Santa Cruz Lesbian and Gay Community Ctr. v. Trump*, 508 F. Supp. 3d 521, 542 (N.D. Cal. 2020) ("Federal funding is crucial to university research, 'providing over 60 percent of [some] institutions' research budgets."). Without those grants, those institutions cannot pay faculty and researcher salaries. An overall budgetary hit will shift resource allocation, and some institutions will likely not be able to continue various research and degree programs, whether or not those programs are implicated by the order. Many of AAUP's members are university faculty that will lose grants, laboratories, research staff, employment, and employment opportunities. Ex. 20, AAUP Decl. ¶ 21-25; *Cf. Planned Parenthood of Cen. N. Carolina v. Cansler*, 804 F. Supp. 2d 482, 498–99 (M.D.N.C. 2011) (finding irreparable harm where plaintiffs demonstrated that if funding were withheld, they would need "to close facilities, lay-off employees and cease providing certain . . . services").

The threats of loss of funding and federal investigation, as well as the resulting reputational and economic harms that flow from the Certification Requirement far exceed monetary damages. They are a death sentence for organizations which, like Plaintiffs and their members, rely on federal funding to survive. The fact that the Certification Requirement is in violation of bedrock constitutional principles of Separation of Powers pulls these harms, as well as the loss of free expression, further still from simple monetary damage. *See New York v. Trump*, 2025 U.S. Dist. LEXIS 17593, at *16-17 (D.R.I. Jan. 31, 2025).

### F.  Plaintiffs Are Suffering Irreparable Harm from the Investigation Provision.

The Investigation Provision likewise causes irreparable harm by violating NADOHE's and AAUP's free speech rights. The members of Plaintiff NADOHE and AAUP credibly fear they will be targets of the Investigation Provision and suffer immediate fallout from being included on the target list. Specifically, Plaintiff NADOHE counts among its members several "institutions of higher education with endowments over 1 billion dollars," that promote "DEI programs or principles" which could arguably violate the J21 Executive Order. Ex. 19, NADOHE Decl. ¶ 5, 31. And NADOHE has individual members who are diversity professionals, like Chief Diversity Officers, whose very roles demand that they uphold the principles of diversity, equity, and inclusion at their respective institutions. Ex. 19, NADOHE Decl. ¶ 6. Likewise, AAUP's members who work at institutions of higher education with large endowments fear that their belief in, and promotion of, diversity, equity, and inclusion principles will place their livelihoods and institutions at risk. *See, e.g.*, Ex. 20, AAUP Decl. ¶¶ 23-25, 40-41.

The only way for the members of NADOHE and AAUP to ensure that they will not face investigation, criminal or civil, is to cease all programs and practices that might be considered "DEI programs or principles" regardless of the actual legality of those practices, including by

eliminating the offices run by NADOHE's individual diversity professional members. Ex. 19, NADOHE Decl. ¶ 48; *see also* Ex. 20, AAUP Decl. ¶¶ 28, 31. The only way for individual members charged with advancing DEI programs at such universities to keep their jobs is to help them do it. Ex. 19, NADOHE Decl. ¶ 32; *see also* Ex. 20, AAUP Decl. ¶ 40. Plaintiffs and their members must either censor themselves or suffer. The government may not put them in that position. Because the First Amendment does not tolerate that chilling effect and suppression, "most courts hold that no further showing of irreparable injury is necessary." 11A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2948.1 (3d ed. 1998).

Plaintiffs need not wait until Defendants declare their investigations and make their accusations to challenge this unconstitutional provision. The threat is enough. *See New Jersey Civ. Just. Inst. v. Grewal*, No. CV 19-17518, 2021 WL 1138144, at *4 (D.N.J. Mar. 25, 2021).  Federal investigation and prosecution—whether meritorious or not—brings immediate reputational and economic harm and damages that Plaintiffs cannot be forced to withstand. Ex. 19, NADOHE Decl. ¶ 31; Ex. 20, AAUP Decl. ¶ 40-42. Courts have routinely deemed these harms "irreparable" because later monetary damages will be insufficient to remedy the harm. *See, e.g., Montgomery Cty. Ass'n of Realtors v. Realty Photo,* 783 F. Supp. 952, 958 (D. Md. 1992); *Fed. Leasing, Inc. v. Underwriters at Lloyd's*, 650 F.2d 495, 500 (4th Cir. 1981); *North Carolina Growers' Ass'n, Inc. v. Solis*, 644 F. Supp. 2d 664, 670-71 (M.D.N.C. 2009).

## III.    The Balance of Equities and the Public Interest Favor Enjoining the Unlawful Orders

The balance of equities and the public interest favor Plaintiffs. Preliminary injunctive relief is necessary to prevent further harm to Plaintiffs, who will continue to suffer constitutional, existential, and reputational harm. Delayed remedy would be akin to "shut[ting] the stable door after the horse has bolted." *See Juliana v. United States*, 947 F.3d 1159, 1181 (9th Cir. 2020)

(Staton, J., dissenting). Swift elimination of infringement on free speech rights is decidedly in the public interest. *See Nat'l Pub. Radio, Inc. v. Klavans*, 560 F. Supp. 3d 916, 929 (D. Md. 2021) (noting that there is a "well-settled public interest in the freedom of expression") (internal citations omitted). By contrast, Defendants will suffer no harm if the preliminary injunction is granted, just as they suffered no harm from the status quo before the orders were issued.

## IV.    The Court Should Grant the Carefully Crafted Injunctive Relief Requested by Plaintiffs.

Because injunctive relief is warranted for the reasons provided above, this Court should issue a temporary restraining order that maintains the status quo and subsequent preliminary injunctive relief as detailed in Plaintiffs' proposed orders.

### G.  The Court should issue an immediate TRO to maintain the status quo.

Plaintiffs have already suffered irreparable harm. *See supra* at 21-28*.* They move now for a temporary restraining order to prevent further such harm pending resolution of their motion for a preliminary injunction. This Court should exercise its discretion to enter an immediate TRO that maintains the status quo, at least until the preliminary injunction motion can be fully briefed, argued, and decided. *See J.O.P. v. U.S. Dep't of Homeland Security*, 409 F. Supp. 3d 367, 375 (D. Md. 2019).  Here, the status quo includes the TRO granted in another case prohibiting any pauses or freezes of federal funding including based on Defendant Trump's 2025 Executive Orders, *New York v. Trump*, No. 25-cv-39-JJM-PAS, 2025 WL 357368 (D.R.I. Jan. 31, 2025). However, Defendants have claimed repeatedly that the *New York v. Trump* TRO does not impact the President's Executive Orders themselves, including those at issue here, and have appealed. *See e.g., id.*, Doc. 70 at 3. As discussed above, absent a TRO, speech will be chilled, grants or contracts may be unlawfully terminated, unlawful certification requirements may be added to federal grants

or contracts and enforced on federal grantees or contractors, and unlawful target lists may become public, working irreversible harms. Entering a TRO to prevent these events merely maintains the status quo and imposes no harm on the government.

### H.  The Court should issue appropriate preliminary injunctive relief

This Court "has wide discretion to fashion appropriate injunctive relief," *Roe v. Dep't of Def.*, 947 F.3d at 231, to prevent further irreparable harm to Plaintiffs and should exercise that discretion to provide the relief specified in Plaintiffs' proposed order. Moreover, a nationwide injunction is appropriate in this case. The Termination Provision, Certification Requirement, and Investigation Provision apply nationwide to entities similarly situated to Plaintiffs. Like Plaintiffs, they are federal contractors, grantees, and entities identified as targets of the Orders, including criminal and civil compliance investigations. Under these circumstances, nationwide injunctive relief is warranted. *See Roe*, 947 F.3d at 232 ("The Supreme Court recently affirmed the equitable power of district courts, in appropriate cases, to issue nationwide injunctions extending relief to those who are similarly situated to the litigants." (citing *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579-81 (2017)).

### CONCLUSION

For the foregoing reason, Plaintiffs respectfully request that this Court grant its Motion for a Temporary Restraining Order and/or Preliminary Injunction.

Niyati Shah*
Noah Baron*
Alizeh Ahmad*
**Asian Americans Advancing Justice |
  AAJC**
1620 L Street NW, Suite 1050
Washington, DC 20036
(202) 296-2300
nshah@advancingjustice-aajc.org
nbaron@advancingjustice-aajc.org
aahmad@advancingjustice-aajc.org

/s/  *Victoria S. Nugent*
Victoria S. Nugent (Bar No. 15039)
Aleshadye Getachew+
Ananda V. Burra+
Audrey Wiggins*
Brooke Menschel*
J. Sterling Moore*
Orlando Economos*
Skye Perryman*
**Democracy Forward Foundation**
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
vnugent@democracyforward.org
agetachew@democracyforward.org
aburra@democracyforward.org
awiggins@democracyforward.org
bmenschel@democracyforward.org
smoore@democracyforward.org
oeconomos@democracyforward.org
sperryman@democracyforward.org
* admitted pro hac vice
+ admission pending

***Counsel for Plaintiffs***

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that this document and all attachments, filed through the ECF system, were also sent electronically via email on February 13, 2025, to counsel for Defendants (notices of appearance forthcoming):

Joseph Borson, Joseph.Borson@usdoj.gov

Pardis Gheibi, Pardis.Gheibi@usdoj.gov

John Griffiths, John.Griffiths@usdoj.gov

/s/      *Victoria Nugent*
Victoria S. Nugent (Bar No. 15039)
Counsel for Plaintiffs